Filed 11/6/20  Barr v. Parker-Hannifin Corp. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BARRY BARR, AS SUCCESSOR IN INTEREST,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PARKER-HANNIFIN CORPORATION, ET AL.,<br><br>    Defendants and Appellants. | A156632<br><br>(Alameda County<br>Super. Ct. No. RG17880698) |

Barbara Barr developed mesothelioma decades after she was exposed to automotive brake products containing asbestos that were made by defendants Parker-Hannifin Corporation (Parker) and its successor Standard Motor Products (Standard).[1]  A jury found in favor of Barr, awarding compensatory damages against both Parker and Standard.  The jury also awarded punitive damages against Parker.  On appeal,[2] Standard contends reversal is required because the trial court erred in excluding evidence of

_____

[1] Barr died shortly after the notice of appeal was filed.  We granted the unopposed motion by Barr's adult son, Barry Barr, to substitute in as her successor in interest.

[2] Although defendants have separately appealed, they join and incorporate each other's arguments.  At times, we will refer collectively to Parker and Standard as defendants and individually where necessary.

alternate sources of Barr's asbestos exposure. Parker claims the evidence of malice was insufficient to support an award of punitive damages and that the award violates due process. We affirm.

## BACKGROUND

Asbestos is a naturally occurring mineral that has historically been used in various commercial products, including automotive brakes. Approximately, 95 percent of asbestos is chrysotile, which belongs to the serpentine mineral group. The remaining 5 percent is amosite and crocidolite, belonging to the amphibole mineral group.

In 1978, Parker purchased EIS, a manufacturer and seller of brake products. Parker, through its EIS division, sold the brakes until EIS was purchased by Standard in 1986. It is undisputed that from 1978 until 1988 EIS brakes contained asbestos.

In 1979, Barr and her then husband, David Knecht opened an automotive parts and repair shop in Grass Valley, California. Barr primarily worked in the retail area, selling parts. She frequently went into the service bays where Knecht did brake jobs. Knecht used compressed air when servicing automotive brakes to blow dust from brake drums and assemblies.

Beginning in 1981, Barr and Knecht exclusively sold EIS brakes. Barr did not see any warnings on the boxes or any other paperwork associated with the EIS brakes. Barr opened the boxes and personally handled new EIS brakes. She also handled used EIS cores when she sent them back to the distributor. Barr routinely cleaned up dust that accumulated in the store from the brake work performed in the adjacent service bays. She also washed Knecht's dirty work clothes. Barr stopped working at the store in 1988.

In 2017, Barr was diagnosed with mesothelioma at age 71. Mesothelioma is a fatal cancer that affects the lining of the lungs. The only known cause of mesothelioma in North America is asbestos exposure.

The jury found that EIS brakes were a substantial factor in Barr's risk of developing mesothelioma, and that defendants were liable under negligence, design defect, and failure to warn theories. The jury awarded $8 million in past and future noneconomic damages, and about $620,000 in economic damages. The jury allocated 85 percent of fault to EIS brakes, and the remaining 15 percent was equally divided among three other brake manufacturers. The other defendants were Bendix, Wagner, and Raybestos. The jury did not find Standard liable for punitive damages, but awarded $6 million in punitive damages against Parker.

## I. The Trial Court's Exclusion of Evidence

Barr moved in limine to exclude evidence that her father worked as a welder at the Hunters Point Naval Shipyard (Hunters Point). The court granted the in limine motion and further precluded any reference to Barr's unwillingness to sign an authorization for release of her father's employment records. The trial court also excluded Barr's interrogatory responses and allegations from her complaint in which she asserted she was exposed to asbestos from two other brake brands in addition to EIS, as well as from gaskets and clutches made by several other companies.

Standard, joined by Parker, argues the evidence about her father's employment was relevant to the defense theory that Barr's mesothelioma was caused by her exposure to amphibole asbestos that he brought home on his work clothes. Standard further contends that exclusion of Barr's discovery responses and complaint allegations prevented the jury from allocating fault to other brake, gasket, and clutch manufacturers.

Although it is well-established that we review evidentiary rulings for an abuse of discretion (see *LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 485), Standard argues that we should review the issue de novo because exclusion of the proffered testimony was tantamount to a grant of nonsuit on its theory that Barr was exposed to shipyard asbestos. (See, e.g., *Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1280 [granting motion in limine to exclude all evidence on an element of proof is equivalent to a nonsuit].)  While the trial court's evidentiary rulings had the effect of excluding evidence which the defense hoped would demonstrate an alternate source of Barr's exposure, the court did not exclude *all* defense evidence of other sources.  The challenged evidence was excluded because it was found insufficiently probative of the defense theory of alternate causation under the ordinary rules of evidence.  Accordingly, we will review its exclusion for an abuse of discretion.

## A.    *Proposed Testimony of Barr and Her Siblings*

The trial court excluded all testimony from Barr and her siblings that their father, Moses Kleinberg, worked as a welder at Hunters Point when Barr was growing up.  Barr testified in deposition that she lived with her parents and her siblings until she was 18 years old.  Barr never visited Kleinberg at work and she had no information about his job duties.  Barr did not wash her father's clothing.  She did not know if her father was a government employee or a private contractor.  She also did not know if her father worked on military ships or civilian ships.  Barr did not recall anything about the condition of her father's clothing when he came home from work.

Barr's sister, Ilene Poindexter, testified in deposition that her father worked on ships at Hunters Point.  She had no specific information about

4

what he did there, other than he worked as a welder. She never visited her father at work. Poindexter never saw Barr doing the laundry. Poindexter did not recall seeing dirt on her father's work clothes.

Barr's brother, David Kleinberg, also testified in deposition that his father worked as a welder at Hunters Point, but he never visited him there, and did not know exactly what he did. He also had no information that his father ever worked with insulation in his job. David Kleinberg did not recall that his father wore special clothes to work; he did not recall his father's clothing being dusty; and he did not remember if his father showered after work.

Generally, witnesses must have personal knowledge of a subject for their testimony to be admissible. (Evid. Code, § 702, subd. (a).) "Personal knowledge means a present recollection of an impression derived from the exercise of the witness's own senses. [Citation.] A witness cannot competently testify to facts of which he or she has no personal knowledge. [Citation.]" (*Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 731 (*Alvarez* ), abrogated on other grounds in *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 74, fn. 3.)

Even if Barr's deposition testimony that her father was a welder would have been admissible as a party admission, neither Barr nor her siblings had any personal knowledge of the facts pertaining to their father's work at the shipyard, and any testimony from them regarding their father's employment was properly excluded as irrelevant. Evidence is "relevant" if it has any tendency in reason to prove or disprove any disputed fact of consequence. (Evid. Code, § 210.) Conversely, evidence is irrelevant when it only invites speculation. If the existence or nonexistence of a disputed fact to be inferred from proffered evidence is based on speculation, conjecture, or

5

surmise, the proffered evidence is irrelevant. (See *People v. Louie* (1984) 158 Cal.App.3d Supp. 28, 47.) The inferences defendants sought the jury to draw here were that Barr's father was *possibly* exposed to asbestos at the shipyard, further that he brought asbestos home on his clothing, and that Barr was exposed to this asbestos. These inferences would be based on mere speculation and conjecture. The trial court did not abuse its discretion in excluding this testimony of Barr and her siblings.

**B.** **Barr's Refusal to Sign a Release Regarding Her Father's Employment Records**

Prior to trial, defendants moved to compel Barr to sign an authorization for release of her father's employment records. The trial court denied the motion, on the basis that defendants failed to offer any authority for such an order. Later, the trial court precluded defendants from referring to Barr's refusal to sign the release. According to defendants, the jury should have been allowed to hear about Barr's "suppression of evidence." We disagree.

It is well established that California courts lack the power to order civil discovery by a method that is not authorized in the Code of Civil Procedure. (*Haniff v. Superior Court* (2017) 9 Cal.App.5th 191, 200.) The request that a party sign a release for a non-party's employment records is not a method expressly or impliedly included in the Civil Discovery Act. (See, e.g., Code Civ. Proc., § 2019.010.) Accordingly, Barr had no obligation to sign the authorization. We fail to see how Barr could have "suppressed" evidence she was never required to produce. The trial court did not abuse its discretion when it excluded any defense reference to Barr's refusal to sign the release.

## C. *Barr's Complaint Allegations and Interrogatory Responses*

Defendants contend a new trial is warranted because the trial court erroneously excluded allegations in Barr's complaint and her interrogatory responses that she was exposed to asbestos from friction products made and sold by several defendants other than Standard and Parker. According to defendants, the allegations and interrogatory responses were admissible as judicial admissions that would have undermined Barr's theories and supported the defense case.

On direct examination, Barr testified that she could not remember the product names of any brakes other than EIS. Near the end of trial, defendants sought to read one of Barr's interrogatory responses to the jury. The interrogatory asked Barr to list the manner and duration of each claimed employment-related asbestos exposure. Barr responded that during her co-ownership of automotive businesses with her former husband, she "purchased brakes, specifically EIS, Wagner and Bendix brakes, clutches, specifically BorgWarner and gaskets, specifically Fel-Pro and McCord, through wholesalers," and that she "was exposed on a daily basis to the products that were handled, removed and replaced by herself and others."

The court denied the request on Evidence Code section 352 grounds, on the basis that the interrogatory answers were "formulaic responses by attorneys early in the litigation," and it did not consider them to be "the true thought-out responses" of Barr. The court concluded that in light of the "paucity of evidence" presented by the defense to justify "contribution by other parties," permitting defendants to read Barr's answer would be unfairly prejudicial.

Defendants contend that excluding these statements was erroneous because they constitute admissions by Barr that non-EIS brakes, gaskets and

clutches contributed to her mesothelioma. They assert that this evidence would have contradicted Barr's theory of liability and allowed the jury to allocate fault to the other defendants.

First, the record does not demonstrate that the allegations in the complaint were judicial admissions. A judicial admission is a fact alleged by one party that has been admitted by the opposing party. It is removed from the litigation because the parties agree on its truth. (*Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 451-452.) Here, Barr's claim that she was exposed to asbestos products manufactured by other defendants was contested throughout the litigation. These statements were not judicial admissions. Rather, Barr's allegations and interrogatory answers were possibly admissible under the exception to hearsay for an admission by a party opponent. (Evid. Code § 1220.) Assuming the statements were admissible on this basis, the trial court has broad discretion under Evidence code section 352 to exclude otherwise admissible evidence. (*Webber v. Inland Empire Investments* (1999) 74 Cal.App.4th 884, 910.)

To the extent the allegations and interrogatory responses were minimally relevant, their probative value was outweighed by the potential for undue prejudice of confusing the issues and misleading the jury regarding the role of absent defendants. On this record, the jury would likely have been misled into believing that all the former parties to the litigation, irrespective of individual fault, played a part in causing Barr's mesothelioma. Additionally, Barr's counsel would have had to explain to the jury the reasons others were sued, and the purpose that pleadings and discovery serve at various stages of the litigation. Such matters were wholly irrelevant to the issues the jury was charged to decide. The trial court acted well within its broad discretion in excluding this evidence.

Moreover, even if the court erred in excluding this evidence, the defendants have not established prejudice. "A court's error in excluding evidence is grounds for reversal only if the appellant demonstrates a miscarriage of justice, that is, that a different result would have been probable had the error not occurred." (*Major v. R.J. Reynolds Tobacco Co.* (2017) 14 Cal.App.5th 1179, 1202 (*Major*).) Defendants were not prevented from introducing evidence regarding Barr's exposure to non-EIS brakes, gaskets and clutches. Rather, defendants were merely prevented from relying on Barr's allegations and statements to do so. The jury did hear evidence that Barr was exposed to non-EIS brakes and it apportioned fault to Wagner and Bendix brakes, as well as to Raybestos, a brand of brakes not even identified in Barr's responses.

The jury also heard evidence from Barr and the defendants that she was exposed to asbestos from gaskets and clutches, which contributed to her risk of developing mesothelioma. Barr's material scientist testified that both A-1 Clutch and BorgWarner clutches contained asbestos. Barr's occupational health expert testified that Barr experienced some minor exposure to asbestos from clutch repairs. Similarly, defendants' industrial hygienist testified that Barr was exposed to asbestos from both clutch and gasket work.

The jury rejected those opinions and found that only exposure to asbestos from brakes was a substantial factor contributing to Barr's harm. The jury apportioned no fault to any clutch or gasket manufacturer even though Barr's counsel explicitly told the jury in closing arguments that he thought some percentage of fault, albeit a small one, should be assigned to A-1 Clutch. Where the jury rejects the causation opinions of a qualified expert, the exclusion of a plaintiff's lay opinion of causation is unlikely to have had any prejudicial effect. (*Major, supra,* 14 Cal.App.5th at p. 1204.)

9

Accordingly, the exclusion of Barr's complaint and discovery responses was not prejudicial and does not warrant the drastic remedy of a new trial.[3] (See, *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

## D. *Testimony of Former Shipyard Welder*

The trial court excluded proposed testimony from Jerry Casaba, a former welder at Hunters Point. Casaba testified in deposition that welders would often use blankets, gloves, and sleeves containing asbestos. Casaba, however, preferred using "leathers" rather than the asbestos sleeves. Casaba had never met Moses Kleinberg and had no personal information that Kleinberg ever worked at Hunters Point. Instead, Casaba testified as to what he did, including that he wore coveralls for dirty jobs, and sometimes wore his street clothes. Casaba saw other welders working in street clothes or coveralls. He did not know what Kleinberg wore to work or if he ever took showers in the shower rooms at the shipyard. Casaba did not know if the two of them ever worked on the same ships. Casaba acknowledged that welders performed a variety of jobs at the shipyard, some on ships, and some in "shops" located outside. He did not know if Kleinberg worked inside ships or topside on deck.

---

[3] Standard makes the passing statement that it was unfair to exclude Barr's interrogatory responses while admitting a mistaken "slip of the pen" interrogatory response from Standard that its brakes contained crocidolite—the most toxic form of asbestos—instead of chrysotile. But Standard presents no cogent legal argument supported by applicable authority. Instead, it merely asserts, "What's good for the goose is good for the gander." To the extent Standard appears to challenge the propriety of the trial court's admission of this interrogatory response, the challenge has been forfeited on appeal. (See *Strutt v. Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 873 ["An appellate court is not required to consider alleged errors where the appellant merely complains of them without pertinent argument."]) We will not entertain this argument.

Casaba's possible testimony regarding what he did at Hunters Point was properly excluded because it would have been irrelevant. Casaba's deposition testimony did not establish that all welders at the shipyard were exposed to asbestos. The fact that he and other welders sometimes worked in street clothes and used asbestos-containing blankets, gloves and sleeves, does not establish that Kleinberg was exposed to asbestos at the shipyard, let alone that he brought asbestos home on his clothing or exposed Barr to it. This proposed testimony was speculative and pure conjecture on the issue of alternate causation. The trial court acted well within its discretion in excluding this evidence.

## E. *Expert Witness Deposition Testimony*

The trial court excluded evidence regarding defendants' take-home exposure theory because defendants had not shown "beyond speculation" that Kleinberg was exposed to asbestos at the shipyard, that he brought it home, or that Barr had been exposed to it.

The majority of expert witnesses, both plaintiff and defense, testified at deposition that they could not opine that Barr was exposed to asbestos brought home on Kleinberg's clothing because they lacked information about his work at the shipyard. For example, Barr's material scientist, Dr. William Longo testified that he was aware that asbestos products were used in Navy shipyards during the time Kleinberg worked at Hunters Point, but he could not opine that Kleinberg was exposed without some foundational evidence of his particular job duties, "other than being a welder." Similarly, Barr's other experts, an epidemiologist, two industrial hygienists, and a toxicologist, lacked foundational evidence that Kleinberg was exposed to asbestos and brought that asbestos home.

Despite the absence of evidence regarding the specifics of Kleinberg's work, several defense experts were prepared to testify at trial that Kleinberg was exposed to asbestos due to his work around amosite-containing insulation at Hunters Point. These experts intended to testify that Kleinberg brought home amosite asbestos on his clothing, and Barr was exposed to this asbestos.

Defendants' Navy expert, Captain Charles Wasson, testified that as a welder, Kleinberg would have "spent a large portion [of his time] out on the ships[,]" and as a result that Kleinberg "had an opportunity for exposure." However, Wasson had no information regarding Kleinberg's work at Hunters Point other than he was a welder. Wasson reviewed Casaba's deposition testimony, and acknowledged that what Casaba did at Hunters Point "is not necessarily what Kleinberg did." While Wasson personally spent time onboard a Naval ship while it was overhauled at Hunters Point in 1961, Wasson did not know Kleinberg or observe his work.

Defendants' industrial hygienist John "Tony" Watson testified that Kleinberg was likely exposed to amosite-containing insulation. According to Watson, "[i]t would be an absolute miracle, nearly impossible," that a welder in a shipyard where naval ships were overhauled and repaired would not have been exposed. However, Watson could not link any amosite insulation to Kleinberg. He did not know if Kleinberg worked on a ship or in the yard. He did not know what job duties Kleinberg had at the shipyard, other than welding. He admitted that one could decontaminate by showering at work, but he did not know whether Kleinberg showered and changed clothing before he went home.

Defendants' epidemiologist Dr. Gabor Mezei testified that in his opinion, Kleinberg worked onboard ships and worked near others working

with insulation.  He opined that Kleinberg was exposed to asbestos as a result, and he brought this asbestos fiber home on his clothing and person. Mezei based this testimony solely on Kleinberg's job title of welder and the general epidemiological literature showing increased rates of mesothelioma among shipyard welders.  However, Mezei had no information regarding specific tasks Kleinberg performed on a given day.  He admitted that he did not know whether Kleinberg showered before going home, and he could not state definitively that Kleinberg worked with or around amphibole insulation.

An expert's opinion has no evidentiary value and does not assist the trier of fact when it is based on assumptions of facts that are speculative or conjectural.  (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1233 (*Casey*).)  Thus, "under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative.  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.)  Stated another way, "the court must . . . determine whether the matter relied on can provide a reasonable basis for that opinion or whether that opinion is based on a leap of logic or conjecture."  (*Id.* at p. 772.)

Here, the only evidence that Kleinberg worked as a welder at Hunters Point came from Barr and her siblings.  This evidence was properly excluded and thin at best.  However, even assuming that Kleinberg was a welder at the shipyard, the only evidence of his duties there came from his job title. There was no evidence that Kleinberg was ever exposed to asbestos or that he brought asbestos home on his clothing.

Without evidence of exposure there is no causation.  (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982.)  Mere presence at a site where asbestos was present is insufficient to establish legally significant asbestos exposure.  (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 112.)  The simple "possibility" of exposure similarly does not suffice.  (*McGonnell v. Kaiser Gypsum Company, Inc.* (2002) 98 Cal.App.4th 1098, 1105 (*McGonnell*) [speculation that at some time plaintiff might have cut into a wall that might have contained defendant's compound that might have contained asbestos is insufficient evidence].)  There must be some evidence that exposure actually occurred.  (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 203.)  The testimony from numerous experts that Kleinberg *could* have been exposed to asbestos at the shipyard, that he *could* have brought this asbestos home, and that Barr *could* have been exposed to it is not sufficient to demonstrate alternate causation.

Without evidence of actual exposure to asbestos, defendants' proffered expert testimony "creates only a dwindling stream of probabilities that narrow into conjecture.'" (*McGonnell, supra,* 98 Cal.App.4th at p. 1105.)  This type of opinion has negligible evidentiary value.  (*Id.* at p. 1106.)  "Indeed, exclusion of expert opinions that rest on conjecture or surmise is an inherent corollary to the foundational predicate for admission of expert evidence.  (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117, 1119 [expert opinion that if a "constellation of events" occurred, then the injury would occur, is not helpful absent additional evidence that more likely than not such "constellation of events" occurred].)  Accordingly, an expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed

14

facts exist in a given case, is lacking foundation. (See *ibid.*)" (*Casey, supra,* 206 Cal.App.4th at p. 1235.)

Since an expert opinion " 'is worth no more than the reasons and facts on which it is based,'" the proffered expert opinion that Barr was exposed to asbestos brought home by her father had " 'no evidentiary value.'" (*Casey, supra,* 206 Cal.App.4th at p. 1236.) The trial court did not abuse its discretion in excluding the proffered testimony that Kleinberg was exposed to asbestos at work, that he brought the asbestos home, and as a result Barr was exposed to it.

## II. The Punitive Damages Award

Parker, joined by Standard, contends there is insufficient evidence of malice to support punitive damages. Parker also argues that the punitive damages award violated due process because it was based on the defense's litigation conduct rather than on the conduct that injured Barr.

### A. *Evidence at Trial*

Barr presented evidence that by 1964 the risks of asbestos exposure had received national media attention. In 1964 Dr. Irving Selikoff, a leading researcher on asbestos, held a large conference on asbestos-related disease that was attended by members of industry, labor, science and government. Numerous studies were presented that consistently and repeatedly concluded "asbestos causes asbestosis, it causes lung cancer, and it causes mesothelioma." In 1965, the findings of the conference were published and publicly available.

By the late 1970s, the connection between asbestos and disease was irrefutable among the scientific community. "[B]y 1978 it was very clear that asbestos caused death, disability, and disease." According to the medical literature of the time, "[i]f a product contained asbestos . . . [and] that

15

asbestos was released" and inhaled, "it was . . . certain that disease could result."

Parker's designated corporate representative, Sanford Kay, testified about the company's knowledge of asbestos hazards. Kay was a corporate executive at Standard from 1976 until he retired in 2012. During this time, Kay was Standard's corporate secretary and vice-president of human resources. Kay was a member of Standard's due diligence team that examined Parker's EIS brake division when Standard purchased the EIS line from Parker in 1986.

Kay testified that Parker manufactured and sold EIS brakes with asbestos linings from the time that it purchased the company in 1978 until it sold EIS to Standard in 1986. The friction linings on EIS brakes were intended to wear down through ordinary use. Parker expected that customers purchasing EIS brakes would replace worn brakes with brakes purchased from EIS. At no time, however, did Parker conduct testing regarding whether asbestos was released during a routine brake replacement procedure.

As of 1972, following the promulgation of the Occupational Safety and Health Administration (OSHA) limits on asbestos-containing products in the workplace, Parker knew that inhalation of asbestos dust posed a potential health hazard.

During the 1970s and 1980s, Parker warned its employees that exposure to brake dust was hazardous. Workers were told that EIS brakes contained asbestos. They were advised to avoid disturbing brake dust, and not use compressed air to clean surfaces. Parker also made the material safety data sheets (MSDS) it received from its friction material suppliers available to its employees. The sheets provided information about hazardous

materials in the friction linings, and were available to anyone at the plant in a binder in the plant's offices. But Parker never provided the MSDS sheets to its customers.

Daniel Kudek worked at the EIS plant from 1978 through 1986. Employees there handled boxes of EIS brake cores and the cores themselves. Parker provided these employees with disposable coveralls and masks to protect them from "free asbestos in the boxes." Parker also protected employees with vacuum systems in areas where they had potential exposure to brake dust. The vacuums pulled brake dust directly off the machines so it would stay out of employees' breathing space, and help ensure their working conditions were clean.

Parker provided its employees who cleaned the brake dust collection system with fitted canister respirators and coveralls to protect them from exposure to dust. Parker disposed of the collected brake dust through a private company that specialized in hazardous waste disposal.

Parker also conducted routine air monitoring at its plant to ensure that its workers were not exposed to hazardous levels of asbestos. Employees were also offered annual chest x-rays and pulmonary function tests to screen them for lung disease.

## B. *Governing Principles*

Punitive damages may be awarded pursuant to Civil Code section 3294 when a plaintiff proves by clear and convincing evidence that a defendant has acted with oppression, fraud, or malice. The statute defines "Malice" as either (1) "conduct which is intended by the defendant to cause injury to the plaintiff," or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) " '[M]alice does not require actual intent to harm. . . .

17

Conscious disregard for the safety of another may be sufficient where the defendant is aware of the probable dangerous consequences of his or her conduct and he or she willfully fails to avoid such consequences.' " (*Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, 1139 (*Romo*), overruled on other grounds in *People v. Ault* (2004) 33 Cal.4th 1250, 1272.)

In the case of a corporate defendant, liability attaches where "an officer, director, or managing agent" authorized or ratified the oppression, fraud, or malice.  (Civ. Code, § 3294, subd. (b).)  For the purpose of determining punitive damages, "managing agents" are defined as "those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999)  21 Cal.4th 563, 566-567.)  However, it is a "fundamental misconception of the required proof" to suggest, as defendants do, that Barr was "required to introduce clear and convincing proof that at least one particular . . . employee, officer, director or managing agent [of a defendant] had the requisite malicious state of mind." (*Romo, supra*, 99 Cal. App.4th at p. 1139, italics omitted.)  Indeed, the complexities of the modern corporation are such that "[i]t is difficult to imagine how corporate malice could be shown in the case of a large corporation except by piecing together knowledge and acts of the corporation's multitude of managing agents." (*Id.* at p. 1141.)  "There is no requirement that the evidence establish that a particular committee or officer of the corporation acted on a particular date with 'malice.' " (*Id.* at p. 1140.)  Rather, "[i]t is enough if the evidence permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in 'willful and conscious disregard of the rights or safety of others.' " (*Id.* at p. 1141.)  A plaintiff may satisfy the "managing agent" requirement

18

of Civil Code section 3294, subdivision (b) by presenting evidence beyond mere speculation "that permits an inference that the information in fact moved upward to a point where corporate policy was formulated." (*Romo*, at p. 1141.)

For these reasons, we disagree with defendants' contention that the testimony of Sanford Kay and Daniel Kudek regarding corporate practices was insufficient to justify punitive damages because neither was a managing agent. We instead will review their testimony to determine whether there is substantial evidence to support a clear and convincing inference that within the corporate hierarchy authorized persons acted with the requisite willfulness and conscious disregard of the rights or safety of others.

While the parties agree the substantial evidence standard generally applies to our review, they disagree on how we should apply it to the requirement that a plaintiff prove oppression, fraud, or malice by clear and convincing evidence. Barr asserts that "no heightened standard applies"; whereas Parker asserts the standard of review is whether " 'the record contains "substantial evidence to support a determination by clear and convincing evidence." ' " Our Supreme Court recently answered this question.

We "must account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard. When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. In conducting [our] review, [we] must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact

19

may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

Under this standard, we review the evidence in the light most favorable to Barr, giving her the benefit of every reasonable inference, and resolving all conflicts in her favor, with due attention to the heightened standard of proof. (*Pfeifer v. John Crane* (2013) 220 Cal.App.4th 1270, 1299 (*Pfeifer*).)

## C.    *Substantial Evidence of Malice*

In considering whether there was sufficient evidence of malice to warrant a punitive award, *Pfeifer* guides our review. There, the evidence established that a manufacturer of asbestos-containing packing and gaskets was aware of the dangers of asbestos as early as 1970. (*Pfeiffer, supra,* 220 Cal.App.4th at p. 1300.) In 1972 the defendant began monitoring the air in its factories for asbestos levels in compliance with OSHA regulations, and used engineering controls to suppress dust levels. (*Ibid.*) The defendant warned its employees that asbestos caused asbestosis and cancer, but did not disclose the dangers of asbestos to its customers. (*Ibid.*) Although the defendant knew its customers were replacing gaskets by methods that created asbestos dust, it never tested its products to determine whether those methods generated excessive concentrations of asbestos. (*Ibid.*) In affirming a punitive damages award, the court concluded "the evidence was sufficient to show malice, that is, despicable conduct coupled with a conscious disregard for the safety of others . . . [Defendant] fully understood that asbestos dust endangered workers, but it did not issue warnings to customers until 1983, notwithstanding its awareness that they used the products in ways that generated considerable asbestos dust. Indeed, although [defendant] informed its employees that the asbestos used in making 2150 sheet gaskets caused

cancer, [defendant] provided that information to customers only when they asked for the 2150 safety data sheet. The evidence thus established that [defendant] carried on despicable conduct with an awareness of the 'probable dangerous consequences,' and 'willfully fail[ed] to avoid such consequences.' " (*Pfeifer, supra,* 220 Cal.App.4th at pp. 1300–1301.)

The evidence in this case is analogous. As early as 1972, Parker knew asbestos was hazardous and it took action to protect its own employees from these hazards. For a ten-year period, Parker warned employees about the hazards of asbestos. But Parker did nothing to inform its customers that EIS brakes contained asbestos, or to provide guidance to minimize risk to the end-users of its product. As a result, end-users and bystanders like Barr were unprotected, utilizing neither air monitoring, respirators, nor cleanup precautions.

Parker gave its employees data sheets regarding friction linings, but never made these sheets available to customers. Even though Parker knew that the asbestos friction linings on EIS brakes were designed to wear and be replaced, Parker conducted no research into whether or how much asbestos fiber was released in a typical brake replacement. Parker also never placed a warning on EIS brakes regarding the hazards of asbestos.

This evidence was sufficient to show malice, that is, despicable conduct coupled with a conscious disregard for the safety of others. In view of Parker's compliance with OSHA regulations regarding its own workplace, it is clear Parker fully understood that asbestos dust endangered workers, but did not warn its customers, even though its managing agents knew those customers used the products in ways that generated asbestos dust. Indeed, although Parker informed its employees that breathing asbestos dust was hazardous to their health, customers were not advised of such risks. The

evidence thus established that Parker carried on despicable conduct with an awareness of the "probable dangerous consequences," and "willfully fail[ed]" to avoid those consequences. (*Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1228.)

Parker, like the defendant in *Pfeifer, supra,* 220 Cal.App.4th at p. 1301, maintains the evidence of malice or oppression is insufficient, arguing there was no evidence that it intentionally marketed a product it believed was defective. Parker says there is no evidence it believed "its products posed a health risk to end-users like Ms. Barr." According to Parker, "the weight of epidemiological evidence did not then, and does not now, support the existence of any such risk."

Parker's argument "misapprehends our role as an appellate court. Review for substantial evidence is not trial de novo." (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 866.) When there is substantial evidence to support the jury's actual conclusion, "it is of no consequence that the [jury] believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted.)

The jury could have interpreted the evidence in the manner Parker suggests, but the evidence also supports an interpretation that Parker did not share the known dangers of asbestos with its customers or with individuals who would, predictably, be exposed to dust from its products. Substantial evidence supports the inescapable conclusion that Parker's corporate hierarchy authorized despicable conduct in willful disregard of the safety of its customers.

### D.     *No Due Process Violation*

Parker contends the punitive damages award violates due process and should be stricken because it is based on the litigation conduct of the defense. Not only is this argument forfeited on appeal, it fails on the merits.

Parker contends that in closing argument, Barr's counsel expressly argued that the litigation tactics of Parker and its counsel should form the basis for punitive damages. Parker relies on the following instances. Barr's counsel argued that Parker had "invested more in their selection and planning to defend this case than they ever did to protect people like Barbara Barr." Barr's counsel further argued: "Standard and Parker also came here. They made accusations about Barbara. . . . They came here on this public record and sullied her name; accused her of putting her children and her customers who she knew in her little town at risk. . . . ¶ Unlike most of the harms in this case, that's one you can fix 100 percent." Barr's counsel also accused defense counsel of having "engaged in trickery from the start of this case. They continue to do it today."

Parker never objected to the challenged remarks or otherwise asked for a curative instruction during closing arguments. Rather, outside of the presence of the jury, Parker's counsel objected that the comment from Barr's counsel "about the high-priced defense attorney that the defendant spent money on rather than . . . protecting people" was improper argument. This generic objection did not preserve Parker's due process claim or otherwise put the court on notice that Barr's counsel was improperly arguing that the defense's litigation strategy was the basis for punitive damages. Relying on *Simmons v. Southern Pacific Transportation Co.* (1976) 62 Cal.App.3d 341, 355, Parker claims its trial counsel "objected as effectively as possible under the circumstances[,]" and thus preserved the issue on appeal. *Simmons*

23

involved repeated instances of misconduct from plaintiff's counsel who "from the very beginning of the trial embarked on a campaign of hate, vilification and subterfuge for the sole purpose of prejudicing the jury against [the defendant]." (*Id.* at p. 351.) The failure to object was excused as an objection would have been futile under these circumstances. (*Id.* at p. 355.) *Simmons* is of little assistance to Parker. Here, there is nothing akin to the flagrant and repeated instances of misconduct that occurred in *Simmons.*

Nevertheless, addressing this obviously forfeited claim, it fails on the merits. Nothing in the challenged statements even remotely suggested to the jury that the defense litigation strategy justified punitive damages. In fact, Barr's counsel told the jury that Parker should be held liable for punitive damages because: "this company knew about hazards and didn't fully disclose them[.] That's punitive damages." There is no basis to believe that the jury awarded punitive damages for any other reason.

## DISPOSITION

The judgment is affirmed. Barr's successor-in-interest, Barry Barr, is entitled to costs on appeal.

_____

Siggins, P.J.


WE CONCUR:



_____

Fujisaki, J.




_____

Jackson, J.




*Barr v. Parker-Hanniflin Corporation, et al.* A156632